**Michael B. ANDERSON et al., Appellants,**

v.

**Melvin R. LAIRD, Secretary of Defense of the United States of America, et al.**

**No. 24617.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 8, 1971.

Decided June 30, 1972.

As Amended Aug. 1, 1972.

Certiorari Denied Dec. 18, 1972.

See 93 S.Ct. 690.

Mr. Warren K. Kaplan, Washington, D. C., with whom Mrs. Hope Eastman, and Mr. Lawrence Speiser, Washington, D. C., were on the brief, for appellants.

Mr. Robert J. Higgins, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry and Joseph M. Hannon, Asst. U. S. Attys., were on the brief, for appellees.

Mr. Joseph B. Friedman, Washington, D. C., filed a brief on behalf of the Baptist Joint Committee on Public Affairs, as amicus curiae urging reversal.

Mr. John J. Adams, Washington, D. C., filed a brief on behalf of the General Comm. on Chaplains and Armed Forces Personnel, as amicus curiae urging reversal.

Messrs. Leo Pfeffer, New York City, Joel H. Levy and Albert E. Arent, Washington, D. C., filed a brief on behalf of the American Jewish Congress and others as amicus curiae.

Before BAZELON, Chief Judge, and LEVENTHAL and MacKINNON, Circuit Judges.

PER CURIAM:

The separate opinions of Chief Judge Bazelon and Circuit Judge Leventhal concur in the conclusion that the judgment of the District Court, denying appellants' motions for declaratory and injunctive relief against compulsory chapel

attendance at the military academies should be reversed. The case is remanded for the entry of an appropriate order. Circuit Judge MacKinnon dissents.

BAZELON, Chief Judge:

This appeal seeks reversal of the District Court's decision that the requirement of mandatory chapel attendance for cadets and midshipmen at three federal military academies does not violate the Freedom of Religion Clauses of the First Amendment,[1] or the "religious test" clause of Article Six of the United States Constitution.[2] We reverse, and hold that the regulations at issue are invalid under the Establishment Clause. Although Judge Leventhal joins me in this holding, his reasons are expressed in a separate concurrence. It is the opinion of this writer that the regulations also violate the Free Exercise Clause. Judge MacKinnon, in dissent, would uphold the decision of the District Court, 316 F. Supp. 1081 (D.D.C.1970).

I.

Plaintiffs brought this suit as a class action on behalf of all cadets and midshipmen at the United States Military Academy at West Point, New York, the United States Naval Academy at Annapolis, Maryland, and the United States Air Force Academy at Colorado Springs, Colorado. There is no dispute that the regulations for these three institutions require attendance at Protestant, Catholic or Jewish chapel services on Sundays. The regulations are unequivocal[3] and violations are punished by reprimands, demerits, punishment marching tours, confinement to quarters, and possible expulsion. The Naval and Air Force Academies do allow the midshipmen and cadets to attend services at local churches instead of the academy chapels. No alternative attendance is permitted at West Point because there are no local religious institutions.

The academies permit a cadet or midshipman to change his regular attendance only after he receives permission from the respective chaplains involved and from his parents if he is under twenty-one. The Naval Academy regulations provide that "[r]equests for changes to a different denominational church based on personal whims of the midshipman, rather than a sincere desire to affiliate with the stated denomination, will not be approved."[4] The academies also formally recognize that some cadets and midshipmen may be excused for conscientious objection to church or chapel attendance.[5]

---

1. The First Amendment to the United States Constitution provides in part that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof."

2. Article Six of the Constitution reads in pertinent part: "No religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."

3. The West Point regulation provides: "Attendance at Chapel is part of a cadet's training; no cadet is exempt. Each cadet must attend either the Cadet Chapel, Catholic Chapel or Jewish Chapel service each Sunday, according to announced schedules." Regulations for The United States Cadet Corps of the United States Military Academy, Chapter 8, Section IV, paragraph 819. The Naval Academy regulation provides: "1. The basic requirements concerning religious matters at the Naval Academy are: .

(a) All midshipmen will attend church or chapel services on Sunday mornings but are required to attend at no other times."
Part II, Chapter 15, § 1501 of the United States Naval Academy Regulations.
The Air Force Academy regulation provides:
"Attendance at an established church service is mandatory for those Second, Third and Fourth Classmen present for duty in the Cadet Area."
Air Force Cadet Regulation No. 265–1.

4. Part II, Chapter 15, § 1502.1.a of the United States Naval Academy Regulations.

5. This policy was formulated at a meeting of the Academy Superintendents in 1969: "It is understood that intelligent provisions must be made for bona fide cases where attendance would be in conflict with sincerely held convictions of individual cadets or midshipmen."

To test the constitutionality of these regulations under the Establishment Clause, the District Court applied the reasoning of the Supreme Court in School District of Abington Township v. Schempp:

"The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution." [6]

The court below held that the regulations did not violate the Establishment Clause because the purpose and effect thereof were secular, not religious.

The District Court reasoned that there is a crucial distinction between "attendance" at religious services and "worship" at those services; that the military academies require only attendance at Sunday services for the secular purpose of providing an "overall training program designed to create effective officers and leaders by preparing them to meet all the exigencies of command"; [7] and that the primary effect of compulsory attendance is also secular "in that it enables those who will one day hold command positions to gain an awareness and respect for the force religion has on the lives of men so as to react for the benefit of all in combat crises including the giving of spiritual counseling and guidance to those who turn to religion in such situations." [8]

The District Court found no violation of the Free Exercise Clause because an "individual chooses which service to attend and he chooses whether to participate and worship or not. And for sincerely held reasons he can be excused from attendance." [9]

In making its decision, the court accorded great weight to the opinions and judgments of the military personnel concerned with officer training; noted the unbroken tradition of compulsory chapel attendance at the academies; and relied on the traditional reluctance of courts to interfere in the management of the armed forces.[10]

These regulations, however, exceed the constitutionally permitted scope of governmental power. Study of the history of the First Amendment and the Supreme Court decisions interpreting it instructs that the Establishment Clause was written to abolish certain forms of governmental regulation of religion in order to protect absolutely the core values of religious liberty. Attendance at religious exercises is an activity which under the Establishment Clause a government may never compel.

## II.

The language of the First Amendment expresses the feelings aroused in early

The Eleventh Conference of Superintendents of the Academies of the Armed Forces, Record of Proceedings, April 18, 1969 at 32.

The effect of this policy is unclear, since only three midshipmen have been excused from attendance by the Naval Academy in the past forty years, and no cadet at West Point has ever been excused. However, neither the existence nor the viability of this policy is dispositive in view of the Supreme Court's interpretation of the Establishment Clause. *See* p. 293 *infra.*

6. 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963).

7. Anderson v. Laird, 316 F.Supp. 1081, 1090 (D.D.C.1970).

8. *Ibid.* The court found no violation of the "religious test" clause because of the "close connection between the establishment prohibition and the test oath prohibition. The court having determined that there is no violation of the Establishment Clause . . . it necessarily follows that there can be no violation of the test oath prohibition." *Id.* at 1093.

9. *Id.* at 1091.

10. Citing Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); Nixon v. Secretary of Navy, 422 F.2d 934 (2d Cir. 1970); Raderman v. Kaine, 411 F.2d 1102 (2d. Cir. 1969); Byrne v. Resor, 412 F.2d 774 (3rd Cir. 1969); Smith v. Resor, 406 F.2d 141 (2d Cir. 1969); United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371 (2d Cir. 1968), cert. denied 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969) and others.

America in reaction to the religious conditions and practices transplanted from the Old World. The background of the First Amendment has been probed in depth in many Supreme Court opinions [11] and, in the words of Mr. Justice Rutledge, "[n]o provision of the Constitution is more closely tied to or given content by its generating history than the religious clause of the First Amendment." [12]

Compulsory church attendance was one of the primary restrictions on religious freedom which the Framers of our Constitution sought to abolish.[13] Nonattendance was often treated as an offense which could be severely punished in order to enforce loyalty to an established sect.[14] The "Virginia Bill for Religious Liberty", originally drafted by Thomas Jefferson, was enacted in Virginia in 1786 in the wake of the defeat of the state's tax levy for support of established churches. This legislation culminated James Madison's and Jefferson's struggle for religious liberty in that state. The Bill specifically provided:

> "That no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief. . . ." [15]

This statute seeks to define certain categories of governmental involvement with individual religious conduct which must be prohibited. The writers of the First Amendment abandoned this definitional task in favor of drafting broader language to forbid any law "respecting an establishment of religion, or prohibiting the free exercise thereof". The

---

11. Foremost among these are Mr. Justice Black's Opinion of the Court and Mr. Justice Rutledge's dissent in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed.2d 711 (1947). The two opinions agree that the struggle for religious liberty in Virginia, led by James Madison and Thomas Jefferson, culminated in the drafting of the Religion Clauses of the First Amendment. *See also* Engel v. Vitale, 370 U.S. 421, 431–435, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

12. Everson v. Board of Education, *supra* note 11, 330 U.S. at 33, 67 S.Ct. at 520.

13. The views of Roger Williams, progenitor of the theory of separation of church and state, are succinct on this point:
    "There goes many a ship to sea, with many hundred souls in one ship, whose weal and woe is common, and is a true picture of a commonwealth, or human combination, or society. It hath fallen out sometimes, that both Papists and Protestants, Jews and Turks, may be embarked in one ship; upon which supposal, I affirm that all the liberty of conscience I ever pleaded for, turns upon these two hinges, that none of the Papists, Protestants, Jews, or Turks be forced to come to the ship's prayers or worship, nor compelled from their own particular prayers or worship, if they practice any." 1 Stokes, Church and State in the United States 197 (1950). Also quoted in School District of Abington Township v. Schempp, *supra*

note 6, 374 U.S. at 214, n. 6, 83 S.Ct. at 1567.
For a thorough discussion of the efforts to dis-establish religion during and after the Revolution, *see* S. Cobb, The Rise of Religious Liberty in America 482–509 (1968).

14. In Virginia, the Governor Sir Thomas Dale ordained in 1612 that "non-attendance on religious services entailed a penalty, for the first offense, of the stoppage of allowance; for the second, whipping; for the third, the galley for six months." The first Virginia Assembly whose acts have been recorded provided for absence from Church for one Sunday the fine of five pounds of Tobacco in 1623. And in 1631, absentees from Church were to be fined one shilling for each offence. *See* Cobb, *supra* note 13, at 78, 80, 82–83. What Cobb refers to as "a desire for old-time persecution" occasionally reared its head in eighteenth century Virginia. In 1722, the Grand Jury returned thirteen presentments for absenteeism. *Id.* at 99.
    In Massachusetts, the "law of domicile . . . required all people to live within easy distance of the meeting-house so that all could attend worship." *Id.* at 176. Furthermore, non-attendance at services was punished by a fine of five shillings in 1646. *Id.* at 177.

15. 12 Hening, Statutes of Virginia (1823) 84, also quoted in Everson v. Board of Education, *supra* note 11, 330 U.S. at 13, 67 S.Ct. at 510.

actions which the Virginia legislation forbade indicate a core value which remains protected by the Establishment Clause—freedom from governmental imposition of religious activity. The Supreme Court has recognized that "the provisions of the First Amendment, in the drafting and adoption of which Madison and Jefferson played such leading roles, had the same objective and were intended to provide the same protection against governmental intrusion on religious liberty as the Virginia statute." [16]

The struggle in Virginia also led Madison to write his famed "Memorial and Remonstrance Against Religious Assessments." [17] This document reflects Madison's opposition to official relations between church and state in every form and to every degree, whether the relations afforded a preference to a particular sect or simply aided in general the practice of religion. Thus the word *religion* "connotes the broadest content, determined not by the form or formality of the teaching or where it occurs, but by its essential nature regardless of those details." [18] The Government is prohibited from "establishing" all religions as well as just one.[19] And, it is also the legacy of Madison's writings which teach that certain governmental practices must be abolished completely, no matter how slight an incursion they seem to work on the essential nature of religious liberty.[20]

This brief account reveals that the men who framed the Religion Clauses of the First Amendment were writing to abolish specific governmental practices which destroyed individual religious liberty and thereby "established" religion. Governmental compulsion of church attendance was one of those practices.

### III.

However, the holding in this case does not rest on history alone.[21] The Su-

16. Everson v. Board of Education, *supra* note 11, 330 U.S. at 13, 67 S.Ct. at 510, citing Reynolds v. United States, 98 U.S. 145, 164, 25 L.Ed. 244 (1878); Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1871); and Davis v. Beason. 133 U.S. 333, 342, 10 S.Ct. 299, 33 L.Ed. 637 (1890). *And see* McGowan v. Maryland, 366 U.S. 420, 437, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

17. II Writings of James Madison 183, reproduced in full as the Appendix to Mr. Justice Rutledge's dissent in Everson v. Board of Education, *supra* note 11, 330 U.S. at 63, 67 S.Ct. at 535.

18. Everson v. Board of Education, *supra* note 11, 330 U.S. at 33, 67 S.Ct. at 520 (Rutledge, J., dissenting).

19. The Supreme Court "has rejected unequivocally the contention that the Establishment Clause forbids only govermental preference of one religion over another." School District of Abington Township v. Schempp, *supra* note 6, 374 U.S. at 216, 83 S.Ct. at 1568. *See also* Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 210–211, 68 S.Ct. 461, 92 L.Ed. 469 (1948) and McGowan v. Maryland, 366 U.S. 420, 442, 81 S.Ct. 1101, 6 L.Ed. 2d 393 (1961).

20. J. Madison, "Memorial and Remonstrance", *supra* note 17, quoted in Everson v. Board of Education, *supra* note 11, 330 U.S. at 65–66, 67 S.Ct. at 536:

"[I]t is proper to take alarm at the first experiment on our liberties. We hold this prudent jealousy to be the first duty of citizens, and one of [the] noblest characteristics of the late Revolution. The freemen of America did not wait till usurped power had strengthened itself by exercise, and entangled the question in precedents. They saw all the consequences in the principle, and they avoided the consequences by denying the principle. We revere this lesson too much, soon to forget it. Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? That the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsover?"

21. That the Framers intended to abolish a specific practice might not be dispositive today, at least in the opinion of Mr. Justice Brennan. In *Schempp*, he warned against a "too literal quest for the advice of the Founding Fathers" because of the

preme Court has applied the Establishment Clause in circumstances unfamiliar to early Americans,[22] and has interpreted it to prohibit those governmental actions which pose the same threat to religious liberty as did earlier colonial practices.[23] Thus in Everson v. Board of Education, Mr. Justice Black wrote for the Court:

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." [24]

Our case would seem to be resolved by *Everson*, since the attendance regulations undoubtedly force or influence church attendance, and non-attendance is admittedly punished. The inquiry cannot begin and end with *Everson*, however, for while this reading of the Establishment Clause has been re-affirmed several times [25] it has also been difficult to apply. Certain forms of government involvement which recognize, favor and even support religious interests have been sustained under the Establishment Clause in order to avoid conflict with the Free Exercise Clause.

That conflicts are created by an absolute rendering of each Clause is now well-recognized.[26] In Walz v. Tax Com-

ambiguity of the extant history, but also because the changing circumstances of American life call for a broad application of the principles established in colonial times. 374 U.S. at 237–242, 83 S.Ct. at 1579. He noted that the Fathers were concerned with "far more flagrant intrusions of government into the realm of religion . . ." than we might see today. *Id.* at 237, 83 S.Ct. at 1579. The relevance of history to our opinion in this case is that compulsory attendance laws were among the very "flagrant intrusions" which the Establishment Clause was written to abolish.

22. The Framers "did not limit the constitutional proscription to any particular, dated form of state-supported theological venture." McGowan v. Maryland, 366 U.S. 420, 465, 81 S.Ct. 1101, 1156 (1961) (Opinion of Frankfurter, J.).

23. The Court has framed its task as translating the "majestic generalities of the Bill of Rights, conceived as part of the pattern of liberal government in the eighteenth century, into concrete restraints on officials dealing with the problems of the twentieth century. . . ." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943). A broad interpretation of the Clause is justified by the general language of the Amendment, since, in its final form, the Amendment "did not simply bar a con-

gressional enactment *establishing a church*. . . . [The Court] has found that the First and Fourteenth Amendments afford protection against religious establishment far more extensive than merely to forbid a national or state church." McGowan v. Maryland, 366 U.S. 420, 442, 81 S.Ct. 1101, 1113 (1961).

Mr. Justice Brennan has succinctly stated that the proper inquiry "is whether the practices here challenged threaten those consequences which the Framers deeply feared. . . ." School District of Abington Township v. Schempp, *supra* note 6, 374 U.S. at 236, 83 S.Ct. at 1578.

24. 330 U.S. at 15–16, 67 S.Ct. at 511.

25. *See* Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 210–211, 68 S.Ct. 461, 92 L.Ed. 469 (1948); McGowan v. Maryland, 366 U.S. 420, 443, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); and Torcaso v. Watkins, 367 U.S. 488, 492–493, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961).

26. Scholarly comment on this conflict is extensive. *See, e. g.*, Schwarz, No Imposition of Religion: The Establishment Clause Value, 77 Yale L.J. 692 (1968); Kurland, Of Church and State and the Supreme Court, 29 U.Chi.L.Rev. 1 (1961); Gianella, Religious Liberty, Nonestablishment, and Doctrinal Development, 80 Harv.L.Rev. 1381 (1967); and Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205, 1313 (1970).

mission,[27] relied on by the District Court in this case,[28] Chief Justice Burger pointed out that not only was an absolute separation of church and state impossible, but also the absolute language of both Religion Clauses might have to be ignored in order to accommodate the values protected by each. "The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited."[29]

The need for accommodation between the two Clauses is evident in *Walz*. In that case the Court upheld a New York State tax exemption for houses of religious worship challenged as a violation of the Establishment Clause. The Court recognized that the statute did grant an indirect economic benefit to churches[30] and might therefore violate the Establishment Clause, interpreted as it was in *Everson* as prohibiting laws which *aid* all religions. On the other hand, deliberate exclusion of religious institutions from the tax exemption[31] would possibly violate the Free Exercise Clause.[32] The Chief Justice, writing for the Court, therefore questioned the breadth of the language in *Everson*[33] and devised the principle of benevolent neutrality between State and Church to accommodate no-establishment and free exercise values.[34]

27. 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

28. Anderson v. Laird, *supra* note 7, 316 F. Supp. at 1087.

29. Walz v. Tax Commission, *supra* note 27, 397 U.S. at 669, 90 S.Ct. at 1411.

30. Id. at 674, 90 S.Ct. 1409.

31. The exemption extended to other non-profit charitable property.

32. The opinion in *Walz* refers to other municipal benefits which could not arguably be withdrawn from religious institutions under the Free Exercise Clause:
   "Separation in this context cannot mean absence of all contact; the complexities of modern life inevitably produce some contact and the fire and police protection received by houses of religious worship are no more than incidental benefits accorded all persons or institutions within a State's boundaries, along with many other exempt organizations." *Id.* at 676, 90 S.Ct. at 1415.
   For other difficulties inherent in withdrawing tax exemptions from religious institutions *see* Bittker, Churches, Taxes and the Constitution, 78 Yale L.J. 1285 (1969). *Walz* also draws its lesson that the Establishment Clause must bend to accommodate free exercise rights from four other Supreme Court decisions. In *Everson* itself, the use of public funds to reimburse parents of parochial school children, admittedly an aid to their religious education, was upheld as a neutral form of governmental action which had to be extended to users of religious schools —analogous to governmental police and fire protection. 330 U.S. at 16–18, 67 S. Ct. 504. In Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), a released time program for religious instruction outside New York's public schools was upheld as a neutral "accommodation" to "the religious needs of the people" despite the majority's recognition that the program in fact encouraged religious education. 343 U.S. at 313–315, 72 S.Ct. at 684–685. And in Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) the Court upheld the New York State subsidy of textbooks loaned to parochial school children relying heavily on the analysis of *Everson*. Finally, in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), deference to the Free Exercise Clause mandated the Court's striking down a state statute which provided *no* exceptions for practitioners of special religious sects. *See* the discussion of these cases in *Walz*, 397 U.S. at 669–672, 90 S. Ct. 1409.

33. "The hazards of placing too much weight on a few words or phrases of the Court is abundantly illustrated within the pages of the Court's opinion in *Everson*." Walz v. Tax Commission, *supra* note 27, 397 U.S. at 670, 90 S.Ct. at 1412. The Chief Justice noted that the Court had stated in *Everson* that the government cannot "pass laws which aid one religion, aid all religions, or prefer one religion over another" but had no difficulty in upholding a taxing statute which undoubtedly helped children get to church schools. *Ibid.*

34. *Id.* at 669, 90 S.Ct. 1409.

This principle was mistaken by the District Court as authority for its holding that all First Amendment rights must bend when they conflict with military interests.[35] The Supreme Court's interpretations of the Establishment Clause refer to no overriding secular interests which could ever justify a government's imposition of those religious activities which the Clause was written to abolish. It should be clear from *Walz* that the actions absolutely proscribed by the Establishment Clause, among which is the compulsion of church attendance, could be constitutionally justified only out of the necessity of preserving the right to free exercise of religion.[36] To decline to apply the Clause absolutely in this case is to create a loophole in the scope of its protection which the Supreme Court simply does not admit. This is the crux of the difference of opinion between Judges Leventhal, MacKinnon, and myself.[37]

Admittedly, when the liberties protected by the two Religion Clauses conflict, there must be "play in the joints" between them. But when abolition of governmental imposition of religious activity presents no conflict with the Free Exercise Clause, the principle of accommodation espoused in *Walz* has little relevance.

In this case, rather than conflicting, the two Clauses complement each other and dictate the same result.[38] Abolition of the attendance requirements enhances rather than violates the free exercise rights of cadets and midshipmen. The Establishment Clause should therefore be read as it was in *Everson*: "Neither a state nor the Federal Government . . can force nor influence a person to go to or to remain away from church against his will."[39]

## IV.

The force of this language in *Everson* has not been diminished by subsequent Supreme Court opinions. *Walz* in fact re-affirms the teaching of *Everson* that there are certain forms of governmental involvement with religion which the Establishment Clause prohibits absolutely:

"The general principle deducible from the First Amendment and all that has been said by the Court is this: *that we will not tolerate either governmentally established religion or governmental interference with reli-*

---

35. The District Court prefaced its analysis of the regulations at issue thus:

"Nor is it revolutionary to say that First Amendment rights are not absolute . . . And although the Religion Clauses are couched in absolute terms, it is not realistically possible to have absolute or perfect separation and non-involvement. Zorach v. Clauson . . . The very existence of the clauses denotes an involvement of sorts. As the Chief Justice has said, ' * * * [T]here is room for play in the joints productive of a benevolent neutrality * * *.' Walz v. Tax Commission. . . . " Anderon v. Laird, *supra* note 7, 316 F.Supp. at 1087.

36. Thus, accommodation of the Establishment Clause to permit maintenance of religious personnel and institutions within the military is necessitated not by military interests, but by the mandate of the Free Exercise Clause that soldiers be given the opportunity to worship.

37. The dissenting and concurring opinions disagree as to the sufficiency of the acad-

emies' showing that the regulations are both necessary, and secular in purpose and effect. But neither cites authority for their underlying premise—that military or any other types of interests can "justify" in constitutional terms what is otherwise a clear violation of the Establishment Clause. This type of balancing analysis is confined to judicial interpretation of the Free Exercise Clause, *see, e. g.*, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), in cases where bizarre or disruptive religious practices have been proscribed. It is the history of, and the Supreme Court's applications of, the Establishment Clause which make necessary the holding that no possible showing could validate enforced church attendance. *See* Torcaso v. Watkins, 367 U.S. 488, 494, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) ; Engel v. Vitale, 370 U.S. 421, 425, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

38. *See* Part VI. of this opinion.

39. 330 U.S. at 15, 67 S.Ct. at 511.

*gion. Short of those expressly proscribed governmental acts* there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." [40] (Emphasis added.)

Compulsory attendance requirements fall squarely within this principle. As the history recounted above shows, official adoption of a single creed is not the sole act of establishment. Compulsory attendance at worship and prayer, profession of belief and payment of tithes are necessary concomittants.[41]

The Government's contention that there is a difference between compelling attendance at church and compelling worship or belief [42] is completely without merit. Neither appellees, nor the dissenting opinion *infra,* reveal how a government could possibly compel individual worship or belief other than by compelling certain overt actions—for example, profession of belief in God; recitation

of prayers; or mere presence during Bible readings. Attendance during chapel services is indistinguishable from these other overt actions, the compulsion of which has been declared unconstitutional in Torcaso v. Watkins,[43] School District of Abington Township v. Schempp,[44] and Engel v. Vitale.[45]

It is derived from these cases, as well as from history, that freedom from governmental imposition of religious activity is a core value protected by the Establishment Clause,[46] and that therefore a government may not require an individual to engage in religious practices or be present at religious exercises.[47] The "purpose and effect" test developed in McGowan v. Maryland [48] does not undermine this principle. The test is properly applied when there is some ambiguity about the nature of the activity imposed by the government, and thus some question whether the values protected by the Establishment Clause are actually threatened. In *McGowan* it was neces-

40. 397 U.S. at 669, 90 S.Ct. at 1411–1412.

41. *See generally,* Cobb, *supra* note 13, at 74—301.

42. The District Court accepted this distinction. Anderson v. Laird, *supra* note 7, 316 F.Supp. at 1091. Had it not, we can only speculate as to whether the court would have reached the same result under the "purpose and effect" test or would have recognized that compulsory worship is absolutely prohibited by the Establishment Clause.

43. 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961).

44. 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

45. 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

46. "Almost every Supreme Court Justice who has written an opinion involving the establishment clause has identified no imposition as an establishment value." Schwarz, *supra* note 26 at 721. *See* Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 210–211, 68 S.Ct. 461, 92 L.Ed. 469 (1948) ; Engel v. Vitale, *supra* note 45, 370 U.S. at 431, 82 S.Ct. 1261; Everson v. Board of Education, *supra* note 11, 330 U.S. at 26, 67 S.Ct. 504 (dissenting opinion of Jackson, J.) ; and

Zorach v. Clauson, 343 U.S. 306, 311, 72 S.Ct. 679, 96 L.Ed. 954 (1952).

47. Passing references by the Supreme Court to the fact that the government may not compel church attendance are numerous. "[The government] may not make a religious observance compulsory. It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction." Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952) ; "[The government] cannot make public business of religious worship or instruction, or of attendance at religious institutions of any character." Everson v. Board of Education, *supra* note 11, 330 U.S. at 26, 67 S. Ct. at 516 (dissenting opinion of Jackson, J.) *See also* United Public Workers v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 91 L.Ed. 754 (1947) and Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

48. 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Although the Court did not define the test succinctly until Schempp, the opinions in McGowan analyze extensively the purpose and effect of the laws at issue. *See* the closing paragraph of the Opinion of the Court, 366 U.S. at 453, 81 S.Ct. 1101.

sary for the Court to inquire extensively into the purpose and effect of Maryland's Sunday-closing laws.[49] The Court found that these laws did not impose religious practices on anyone, but allowed individuals to spend the day of rest as they pleased.[50] Since the laws did not threaten to impose religious activity, the secular purpose and effect outweighed any incidental benefit to those who chose to attend services on Sundays.[51]

In later cases, the "purpose and effect" test has been used only to underscore the religious nature of the activity actually imposed by the government. In striking down the Maryland test oath of belief in God in Torcaso v. Watkins, the Court ascertained the purpose and effect of the law from its very language.[52] Re-affirming its approach in Everson, the Court held that governmental imposition of this form of religious exercise—profession of belief—was absolutely proscribed by the First Amendment.[53] In Engel v. Vitale the Court expressed "no doubt that New York's program of daily classroom invocation of God's blessings . . . is a religious activity."[54] Once it was conceded that the prayer was of a "religious nature", inquiry into its possible secular purpose or effect was halted[55] since governmental imposition of this activity could not be justified.

The court in Schempp in fact noted that Bible readings in the public schools could have a secular purpose.[56] However, the Court's factual inquiry into the purpose and effect of the readings began and ended with its recognition that the Bible was an instrument of religion.[57] The conclusion necessarily followed that "the laws require religious exercises and such exercises are being conducted in direct violation of [the pupils'] rights. . . ."[58] Again, no finding of a secular purpose or effect could justify this form of governmental imposition of religion.

Thus the trial court's findings of fact in the case before us cannot avert the impact of the decisions of the Supreme Court. The military regulations on their face compel presence at religious exercises.[59] The appellees do not deny that the chapels conduct genuine services of worship, which include Bible readings and weekly invocations of God's bless-

49. Chief Justice Warren wrote:
    "There is no dispute that the original laws which dealt with Sunday labor were motivated by religious forces. But what we must decide is whether present Sunday legislation, having undergone extensive changes from the earliest forms, still retains its religious character." Id. at 431, 81 S.Ct. at 1108.

50. Id. at 449, 81 S.Ct. 1101.

51. That the "purpose and effect" test is really a balancing test when the core values of the Establishment Clause are not at stake is not stated explicitly by the Supreme Court but is discussed by commentators. See Schwarz supra note 26, at 702–704.

52. "There is, and can be, no dispute about the purpose or effect of the Maryland Declaration of Rights requirement before us— it sets up a religious test which was designed to and, if valid, does bar every person who refuses to declare a belief in God from holding a public 'office . . .'". Torcaso v. Watkins, supra note 43, 367 U.S. at 489–490, 81 S.Ct. at 1681.

53. Id. at 495, 81 S.Ct. 1680.

54. 370 U.S. at 424, 82 S.Ct. at 1264.

55. The Court ignored the attempt by the Board of Regents of New York to "distinguish this prayer because it is based on our spiritual heritage" and thus inculcates more than a religious lesson. Id. at 425, 82 S.Ct. at 1264.

56. The States contended that among the secular purposes of the Bible readings "are the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature." School District of Abington Township v. Schempp, supra note 6, 374 U.S. at 223, 83 S.Ct. at 1572. The Court stated: "[E]ven if its purpose is not strictly religious, . . ." Id. at 224, 83 S.Ct. at 1572, it was impermissible because sought to be accomplished through readings from the Bible.

57. Id. at 224, 83 S.Ct. 1572.

58. Ibid.

59. See note 3, supra.

ings.[60] This is scarcely the *minimal* exposure to religion the dissent would have us believe. The trial court should have investigated "purpose and effect" no further since the very language of the regulations reveals that the government is imposing conduct in violation of the letter and the spirit of the Establishment Clause.

It is of no importance that certain cadets and midshipmen may be excused from attendance for conscientiously held beliefs. Such was also true in *Engel* and *Schempp*. We rely on the Supreme Court's holding in *Engel*:

"The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not. This is not to say, of course, that laws officially prescribing a particular form of religious worship do not involve coercion of such individuals. When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." [61]

We reject also the trial court's allusion to the notion that the attendance requirements ought not be considered compulsory since the military academies are voluntary institutions. It is certainly true that in this case attendance at the academies is not mandatory.[62] However, the Supreme Court's decision in Torcaso v. Watkins turns on its holding that the government may not attach unconstitutional conditions to the award of public employment.[63] An individual's voluntary assumption of an employment or an educational relationship with the government is not a waiver of First Amendment rights.[64]

## V.

The court below, however, grounded its decision in a deference to the unique role of the military in our society. In fact, it is difficult to believe that the trial court would have sustained the attendance requirements were any other than select military educational institutions involved—if, for example, the Government had made church attendance compulsory for all welfare recipients; for all elected officials; or even for all of its fighting forces.[65]

In passing, it should also be noted that the court accorded great weight to the testimony of military officials about

---

60. *See, e. g.,* the worship programs and sermon attached on pages 134–135, and 150–153 of the Appendix.

61. 370 U.S. at 430–431, 82 S.Ct. at 1267.

62. Unlike *Schempp*, Engel v. Vitale and West Virginia Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L. Ed. 1628 (1943) in which attendance at the public schools was mandatory.

63. "The fact, however, that a person is not compelled to hold public office cannot possibly be an excuse for barring him from office by state-imposed criteria forbidden by the Constitution. This was settled by our holding in Wieman v. Updegraff, 344 U.S. 183 [, 73 S.Ct. 215, 219, 97 L.Ed. 216]. We there pointed out that whether or not 'an abstract right to public employment exists,' Congress could not pass a law providing '. . . that no federal

employee shall attend Mass or take any active part in missionary work.'" (footnote omitted). 367 U.S. at 495–496, 81 S.Ct. at 1684.

64. Hamilton v. Regents of the University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934) is not to the contrary. *See* note 80 *infra.*

65. Such possible extensions of the rationale of the District Court's opinion are not to be glossed over. It is not far-fetched to imagine that an imposing argument could be martialed for the proposition that all elected officials should attend church since it is important for them to understand the spiritual forces which motivate and effect a substantial portion of the population in this country, just as such an understanding may be important for our military leaders.

the *effect* of the academy regulations.[66] This casts serious doubt on the validity of the trial court's findings, since those upon whom the regulations have an impact—the students and their religious advisors—are uniquely qualified to testify to their effect.[67] However, it is not necessary to the disposition of this case to overturn the findings, since any factual inquiry, beyond noting that attendance at religious exercises was compelled, was unnecessary.[68]

In contrast to the holding of this opinion that secular interests may never justify governmental imposition of church attendance, the District Court decided that this absolute rendering of the Establishment Clause could be abandoned since the military's interest in training a select group of officers was at stake.[69] This is also the position of the dissenting opinion, *infra*. However, a careful examination of the cases relied on by the District Court indicates that while an individual's freedoms may of necessity be abridged upon his entrance into military life, there is no authority for the point that his right to freedom of religion is abolished.[70]

Personal freedoms of conduct and appearance have been accommodated to the military's perceived need to establish procedures best suited to regulate its day-to-day operations, duty assignments and call-up orders;[71] to determine a reservist's discharge of his duties;[72] to regulate physical appearance;[73] and to ascertain "the essential

---

66. The court below states that it was not "downgrading" the testimony offered by plaintiffs. 316 F.Supp. at 1090. However, the following statement does establish that the District Court relied on military testimony as expert testimony in making its findings of fact:

"[T]he testimony adduced by the plaintiffs was presented by persons who are not now and never have been directly concerned with the training of our military leaders. As moralists the Court must accord them due deference, but in matters military the Court feels constrained to look to the military experts." *Ibid.*

67. The "effect" of a regulation is a separate question from the "necessity" for it. Evidence as to the effect of the attendance requirements from military officials should have been weighed only equally against evidence from other relevant sources—for example, chaplains who have conducted chapel services. Furthermore, since the court below emphasized that the *purpose* of a military regulation may change over the centuries of its existence, it should have been equally open to the possibility that the *effect* may also change and that students presently enrolled in the academies are in the best position to analyze the current effect.

68. *See* Part IV. of this opinion.

69. *See* note 35, *supra.* The District Court also stated:

"As a guiding principle it can be said that the amount of judicial interference with the military should be limited; the amount of deference given the military in matters of discipline and training should be wide." 316 F.Supp. at 1085–1086.

70. *See, e. g.,* Orloff v. Willoughby, *supra* note 10, 345 U.S. 83, 73 S.Ct. 534, 97 L. Ed. 842; Cortright v. Resor, 447 F.2d 245 (2d Cir. 1971); Raderman v. Kaine, *supra* note 10, 411 F.2d 1102, and cases cited in note 10, *supra.* The dissent candidly admits at pp. 308–309, *infra*, that decisions holding that constitutional rights do not apply fully to the military are limited to questions of criminal procedure and military discipline. Although free exercise rights may have to bend to military exigencies, I would again emphasize that this is not authority for the military to *impose* religious exercise on its members.

71. Orloff v. Willoughby, *supra* note 10, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842; Nixon v. Secretary of the Navy, *supra* note 10, 422 F.2d 934; United States ex rel. Schonbrun v. Commanding Officer, *supra* note 10, 403 F.2d 371; Noyd v. McNamara, 378 F.2d 538 (10th Cir. 1967); Luftig v. McNamara, 126 U.S.App.D.C. 4, 373 F.2d 664 cert. denied, 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332 (1967).

72. Fox v. Brown, 402 F.2d 837 (2d Cir. 1968), cert. denied, 394 U.S. 938, 89 S.Ct. 1219, 22 L.Ed.2d 471 (1969).

73. Raderman v. Kaine, *supra* note 10, 411 F.2d 1102; Smith v. Resor, *supra* note 10, 406 F.2d 141; Byrne v. Resor, *supra* note 10, 412 F.2d 774.

characteristics of fitness for duty." [74] This deference to military decisionmaking has been justified by the military's role, its mandate to prepare for the waging of war, and the necessity of this mandate for our national security. However, deference has inherent limitations which have also been fully recognized in judicial decision.

Thus, although First Amendment rights to free speech and expression may be "less" for a soldier than a civilian, they are by no means lost to him. The Second Circuit has emphasized in Cortright v. Resor that "we are far from holding that under no circumstances could a civilian court interfere with a transfer order or prescribe other relief if that were needed to prevent abridgement of a soldier's First Amendment rights." [75]

Individual freedom may not be sacrificed to military interests to the point that constitutional rights are abolished. The military regulations in this case violate the core value of the Establishment Clause [76] and completely abolish its protection. Therefore, judicial action is mandated now.

## VI.

Finally I reach appellants' claim that the attendance regulations are also un-constitutional under the Free Exercise Clause. It has already been ascertained that the academies have made some provision for excusing cadets and midshipmen for "conscientious objections." [77] However, as the Supreme Court has made clear, coercion as well as compulsion is prohibited by the Free Exercise Clause: "The Free Exercise Clause . . . withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion . . . a violation of the Free Exercise Clause is predicated on coercion. . . ." [78]

Adopting this interpretation, I cannot agree with the District Court's bald conclusions that:

"These regulations in no way operate against a cadet in practicing his own religion or in practicing none. The individual chooses which service to attend and he chooses whether to participate and worship or not. And for sincerely held reasons he can be excused from attendance." [79]

It bears emphasis that the fact that attendance at the military academies is voluntary does not eliminate the possibility of coercion.[80] Since there is no dif-

---

74. Wasson v. Trowbridge, 382 F.2d 807, 812 (2d Cir. 1967).

75. *Supra* note 70, 447 F.2d at 254–255.

76. *See* page 288 *supra*.

77. *See* note 5, *supra*.

78. School District of Abington Township v. Schempp, *supra* note 6, 374 U.S. at 222–223, 83 S.Ct. at 1572.

79. Anderson v. Laird, *supra* note 7, 316 F.Supp. at 1091.

80. In Hamilton v. Regents of the University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934) the Supreme Court upheld the constitutionality of the state university's requirement that all students must participate in military training against attack under the Free Exercise Clause. The Court reasoned that since the students were not *compelled* to

attend the university, they were not compelled to violate their religious scruples. 293 U.S. at 262, 55 S.Ct. 197. The continued validity of this reasoning is doubtful in light of recent Supreme Court decisions, *e. g.*, Tinker v. Des Moines Independent School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); Torcaso v. Watkins, *supra* note 43, 367 U.S. 488, 81 S. Ct. 1680, 6 L.Ed.2d 982; Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

Moreover, Mr. Justice Cardozo noted in his concurrence in *Hamilton*, in which he was joined by Justices Brandeis and Stone:

"Instruction in military science is not instruction in the practice or tenets of a religion. Neither directly nor indirectly is government establishing a state reli-

ference between requiring attendance and requiring worship,[81] the District Court's reference to the freedom "to participate or worship or not" is misleading. A single reading of these regulations reveals sufficient coercion to violate the Free Exercise Clause.

First, the failure to attend formal, group worship is punished like any other violation of an academy rule. The most devout believer, who may wish just once or always to worship alone is plainly coerced to attend services. The Supreme Court has recognized in *Engel* and *Schempp* that peer group pressure to conform to established practices is a forceful form of coercion.[82] Thirdly, practitioners of sectarian beliefs may attend only "approved" alternatives to the academy chapels. For certain minorities, and all cadets at West Point, there are no alternatives available. Parental and chaplain approval is required for a change in attendance. And finally, visitation of a variety of religious services, thoroughly consistent with the search for or exercise of religious beliefs, is absolutely prohibited.

These manifest restraints on the free exercise of religion can be saved from unconstitutionality only if they were enacted to serve paramount and compelling state interests; and if there are no alternative means to achieve the government's goals. This dual test of constitutional validity was established by the Supreme Court in Sherbert v. Verner [83] and has been applied in this Circuit.[84] The fact that military interests are involved in this case does not make the test less rigorous.

The military's interest espoused in this case has already been contrasted to "paramount and compelling" concerns which have justified infringements of personal freedoms in the past.[85] This case does not involve programs vital to our immediate national security, or even to military operational or disciplinary procedures. Nor does it appear that the ruling will have any detrimental impact on the academies' training programs. The appellees have made no showing that chapel attendance requirements are the best or the only means to impart to officers some familiarity with religion and its effects on our soldiers.

While some weight must be accorded the military judgment that familiarity with religion is necessary for the all-around officer, it is for this court to assess that "decision in constitutional terms. In the words of Mr. Justice Jackson, we act not by virtue of a superior competence but by virtue of our commission to protect basic constitutional rights.[86] Absent any attempt by appellees to devise an alternative program

gion when it insists upon such training." 293 U.S. at 266, 55 S.Ct. at 206. Thus *Hamilton* is distinguished from this case in which the government compels attendance at admittedly religious exercises.

81. *See* page 288, *supra.*

82. 370 U.S. at 431, 82 S.Ct. 1261 and 374 U.S. at 225, 83 S.Ct. 1560.

83. 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The Free Exercise Clause does not afford absolute protection to overt acts prompted by religious belief if the conduct poses "some substantial threat to public safety, peace or order." *Id.* at 403, 83 S.Ct. at 1793, citing Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244, and Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 among others. Any burden on the free exercise of religion may be justified only "by a 'compelling state interest in the regulation of

a subject within the State's constitutional power to regulate. . . .' NAACP v. Button, 371 U.S. 415, 438 [, 83 S.Ct. 328, 341, 9 L.Ed.2d 405]." *Ibid.* The Court also stated that even if in *Sherbert* there was a threat to some valid state interest, "it would plainly be incumbent upon the appellees to demonstrate that no alternative forms of regulation would [be effective] without infringing First Amendment rights. *Id.* 374 U.S. at 407, 83 S.Ct. at 1796.

84. Barnett v. Rodgers, 133 U.S.App.D.C. 296, 410 F.2d 995 (1969).

85. *See* page 294 *supra.*

86. "[W]e act in these matters not by authority of our competence but by force of our commissions. We cannot, because of modest estimates of our competence in such specialties as public education, withhold the judgment that history authenti-

other than compulsory attendance at the regular chapel services of a single denomination, I am constrained to declare these regulations invalid under the Free Exercise Clause.

LEVENTHAL, Circuit Judge:

I concur in reversal, and in the conclusion that the ⸤Establishment Clause of the First Amendment, which prohibits government measures "respecting an establishing of religion," is violated by the regulations of the various Service Academies requiring Sunday attendance at church or chapel services by cadets (a term used broadly to include midshipmen).

Although I reach the same conclusion as Chief Judge Bazelon on violation of the Establishment Clause, I do not follow the same path. As I understand it, his view is that the compulsory chapel-church attendance requirement is per se a violation of the Establishment Clause, and the justification brought forward by the Service officers and Defense Department officials is not material. Whether the chapel-church attendance regulation would be valid if it were indispensable for officer training and military survival is, for me, a more difficult question than this case requires be answered. It suffices, in my view, that an Academy regulation requiring chapel-church attendance is, at the very least, presumptively invalid as a measure respecting an establishment of religion, and that there is no showing that such an infringement of First Amendment liberties is unavoidably required on ground of military necessity. In view of this conclusion, I find it unnecessary to consider whether these regulations violate the Free Exercise Clause of the First Amendment independently of their violation of the Establishment Clause. I now amplify my reasoning, with references to the record.

1. The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The First Amendment respects religion as a great and important moral force in society. The religious liberty guaranteed by the Constitution embraces two interrelated freedoms: every person is assured the free exercise of his own religion (Free Exercise Clause); and every person is assured freedom from participation by the state concerning his decisions as to exercise of his religion (Establishment Clause). The Establishment Clause assures that the exercise of religion will be truly free—will be voluntary, and not imposed.

The essential requirement of voluntarism is breached by the compulsory Academy regulations.[1] Violations of these, like other, regulations are punished by reprimands, demerits, marching tours, confinement to quarters, and, for repeated violations, expulsion.

cates as the function of this Court when liberty is infringed." West Virginia Board of Education v. Barnette, 319 U.S. 624, 640, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943).

1. There are variations in the respective Academy Regulations concerning alternative worship services available. West Point is not located in any town, and thus cadets must choose to attend either the Catholic, Protestant or Jewish services which are made available at the Academy.

At the Naval Academy, midshipmen are permitted to attend a denominational service in Annapolis in lieu of the Academy church or chapel service. Admiral Cal-

vert testified that at Annapolis "there are twenty-one different church parties of eighteen different denominations" which go into the city each Sunday. One of them "involves two midshipmen who simply go to a man's house for meditation . . . and it is not a regular church service."

As to the Air Force Academy, when the litigation started, chapel was waived only if a cadet attended a church in Colorado Springs approved by the Senior Chaplain. Plaintiffs assailed this approval requirement. As of May 4, 1971, the policy was stated thus, that cadets may fulfill attendance obligations either by attendance at the cadet chapel or by attending civilian churches of their choice, see fn. 5.

The Supreme Court's opinions have explicitly and pointedly reiterated:

> The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government . . . can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.[2]

It is the Government's premise that these judicial expressions, albeit stated in plenary generality, are subject to qualification for particular instances. Accepting that hypothesis for purpose of discussion, the Supreme Court opinions establish at the very least that a government regulation requiring church attendance is prima facie invalid, a badge of religious establishment, and that it would require the strongest kind of demonstration of secularity and necessity in terms of a compelling state interest to establish its validity. Such a showing is not before us in this case.

2. To confine and define the issues of compulsory church attendance, it is important to begin with the proposition, which to me at least seems clear, that the Establishment Clause does not prohibit the Academies from providing property, facilities, and personnel in order to permit chapel and church attendance by cadets on a voluntary basis. In this voluntary context, the scope of the Establishment Clause is affected by the special position of the military and needs of its often isolated personnel, and such expenditures do not constitute an "excessive entanglement" with religion, cf.

Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). This conclusion is borne out by Abington School Dist. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1962). Justice Clark's opinion for the Court, prohibiting a school requirement of Bible readings, reiterates the recognition in Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952), that we "are a religious people whose institutions presuppose a Supreme Being," notes various religious manifestations in our society, and comments (374 U.S. at p. 213, 83 S.Ct. at p. 1566):

> Again, there are such manifestations in our military forces, where those of our citizens who are under the restrictions of military service wish to engage in *voluntary* worship." (Emphasis added.)

Seven justices expressly joined in this opinion, some adding their own. Insofar as the other opinions refer to the matter, they confirm that the special case of the military permits Government aid for religious worship—assuming the core element of voluntarism on the part of the attending military personnel. See 374 U.S. at 296, 83 S.Ct. 1560 (Brennan, J., concurring); at 306, 83 S.Ct. 1560 (Goldberg and Harlan, JJ., concurring) (recognizing the propriety of *allowing* cadets to receive exposure to religion); at 309, 83 S.Ct. 1560 (Stewart, J., dissenting). These references *focus on* military chaplaincies, but I think the same considerations justify any other aid involved in making Sunday chapel available on a voluntary basis.

3. The Government, however, contends that the purpose-effect test set forth in Abington School Dist. v. Schempp, *supra*, at 222, 83 S.Ct. 1560,

2. Everson v. Board of Education, 330 U.S. 1, 15–16, 67 S.Ct. 504, 511, 91 L.Ed.2d 711 (1946) ; Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 210, 68 S.Ct. 461, 92 L.Ed. 469 (1948) ; McGowan v. Maryland, 366 U.S. 420, 443, 81 S. Ct. 1101, 6 L.Ed.2d 393 (1961) ; Torcaso v. Watkins, 367 U.S. 488, 492–493, 81 S. Ct. 1680, 6 L.Ed.2d 982 (1961).

See also, *e. g.*, Zorach v. Clauson, 343 U. S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952), where the Court said: "It [the government] may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction."

establishes the validity of the compulsory chapel regulations because they have a secular purpose and primarily secular effect. The Government puts it that the purpose of compulsory chapel-church attendance is wholly secular, as a training program. "The sole purpose of chapel attendance is to develop in the cadets, through observation of the impact of religion on the lives of others during actual worship services, that sensitivity to religious emotion which is required of a military leader." (Br. 27).

The amicus curiae submission in behalf of religious groups terms the assertion a "shocking" claim to debase and manipulate religious worship as a mere instructional tool, and "trusts that this is but a recently derived contention to seek to avoid the thrust of the First Amendment."[3]

It would be difficult on this record to sustain the conclusion that the purpose of the regulations is wholly secular. We have been asked to look at history, by the Government and the District Court ("tradition cannot be lightly discarded"). The regulations begin with an unmistakable religious premise. The 1970 affidavit of Admiral Calvert, Superintendent of the Naval Academy, sets forth:

"1. Naval Academy records show that since the year 1853 Naval Academy Regulations have included a provision for Sunday chapel attendance by midshipmen as a regular part of the Naval Academy program for training of future naval officers. The articles for the government of the United States Navy in effect at that time charged commanding officers with the responsibility, 'to take care that divine services were performed . . . and that they cause all, or as many of the ship's company as can be spared from duty, to attend at every performance of worship of Almighty God.' Act of April 23, 1800. 6th Congress, 1st Session, 2 Stat. 45.

"The present Naval Academy Regulations are based upon Title 10 US Code, Section 6031, which states, in part, ' . . . commanders of vessels and naval activities to which chaplains are attached shall cause divine service to be performed on Sunday . . . ; and it is earnestly recommended to all officers, seamen, and others in the naval service diligently to attend at every performance of the worship of Almighty God.'

"This statute is also implemented by U.S. Navy Regulations, Article 0711, which states, in part, ' . . . the religious tendencies of individuals shall be recognized and encouraged.'"

There is likewise an unmistakable religious premise in the 1821 General Regulations for the Army which contains an Academy chapel requirement as an act of legislation.[4]

---

3. P. 14 of brief of the General Commission on Chaplains and Armed Forces Personnel. The Baptist Joint Committee on Public Affairs takes a similar view. The General Commission sets forth its interest as follows, brief p. 2:

The Commission was organized in 1917 by the major Protestant denominations supplying chaplains for the Armed Forces and was incorporated under the laws of the District of Columbia in 1955. The Commission is presently comprised of 35 member denominations and five additional consultative and contributing religious bodies with an aggregate membership of 60,000,000 in the United States. The Commission and its related bodies currently recruit about 95% of the Protestant clergy who volunteer for

duty with the military and in veterans hospitals. The Commission functions as a delegated, permanent conference on the chaplaincy of the Armed Forces and the Veterans Administration, and on the moral and religious welfare of armed forces personnel and hospitalized veterans.

4. See Art. 78 of 2 Stat. 45. See, also, art. 100:

Any cadet, who shall behave indecently or irreverently while attending divine service, or shall use any profane oath or execration, or who shall profane the Sabbath, shall be dismissed or otherwise less severely punished, according to the nature of his offense.

A practice is not necessarily frozen in its religious roots, as appears from the decisions upholding the Sunday closing legislation as "having undergone extensive changes from the earliest forms" and not retaining a "religious character." McGowan v. Maryland, 366 U.S. 420, 431, 81 S.Ct. 1101, 1108 (1966).

In the case of compulsory chapel, however, we do not have the kind of long-standing transfer to secular objectives which characterized the Sunday closing legislation.

To some extent there have been changes that reflect a shift from compulsory to voluntary worship, as appears in the shift from the 1800 legislation, 2 Stat. 45, to the current version, 10 U.S.C. § 6031; and see Navy Regs. art. 0711. There is no point in pausing for the problem that the current provisions contain an outright encouragement of religious worship. The fact is that as to the compulsion, that still plainly survives, for chapel-church attendance by Academy cadets, there are references and justifications that plainly retain a religious premise, even in Academy regulations, catalogs and policy statements, issued shortly prior to the filing of this litigation in 1970.[5]

In this litigation, the Government stands on the Chapel Attendance Statement adopted in 1969 by the Superintendents of the four Service Academies, which focuses on the requirement in training terms.[6] As for the mixture of

5. See Cadet Chapel Service, Statement of Policy, H.Q. U.S. Military Academy, 23 December 1957:

> The United States Military Academy accepts responsibility for the total development of a cadet: mental, physical, moral and spiritual. In recognition of this responsibility, the fact that biblical faith is the foundation stone of honor and integrity, and the necessity for every officer to have a first hand knowledge of one of the three great religious traditions of our country, the Academy requires all cadets to attend Protestant, Catholic, or Jewish chapel on Sunday.

The West Point catalog for the 1968–69 academic year assures that "all cadets are provided a sound basic religious atmosphere. Each cadet must attend one of the weekly chapel services—Protestant, Catholic or Jewish."

The Naval Academy catalog for 1968–69 states:

> Because we are "one nation, under God," it is most appropriate that the midshipmen who will some day become the leaders of our Navy should regularly attend Divine Worship Services.

The Air Force Cadet Regulation No. 265–1, promulgated on February 15, 1968 relates to Religious Program, and provides (I,b):

> b. Because a genuine sense of honor, devotion to duty, and absolute integrity are qualities demanded of an officer, and because these qualities are fostered in religious principles and traditions, the Academy requires cadets to attend Catholic, Jewish, or Protestant religious services—expressions of the three great faiths of western civilization. The

Academy's religious program fosters an atmosphere and provides instruction which together help develop the moral strength and integrity of the future officer. Further, the program provides the cadet opportunities for growth in the faith in which he was reared, and it leads him to understand the religious responsibilities of an officer who will command men of many faiths.

> (1) Attendance at scheduled chapel services is considered an essential part of cadet training.

Appellants' motion to supplement the Appendix presents to us the statement of the Air Force Academy superintendent, accompanying an announcement (release of May 4, 1971) that all cadets may fulfill the chapel attendance obligation by attending civilian churches of their choice: "We're convinced of the need to expose our future Air Force leaders to religion. The power of faith and the spiritual dimensions of leadership have played no small part in the history of our country. And one is hard put to name a successful American military leader in our history who has not also at the same time been a man of deep faith."

6. J.A. 133:

> CHAPEL ATTENDANCE

> 1. It is the consensus of the four Superintendents that the purpose of regular attendance at religious services is to instill a sense of respect for religion as a factor in the daily lives and activities of the vast majority of mankind. It is through this respect that officers of the Armed Services can come to understand problems within their future com-

religious and training premises, the Government has developed an alternative position on the appeal, that the primary purpose of the chapel attendance requirement is secular, even if that is not the sole purpose, as stated by the District Court, and that this suffices for validity, assuming the effect as well as the purpose is primarily secular.

4. Accepting, for purpose of discussion, that the Superintendents' subjective purpose is now primarily secular, the objective appearance and effect of the regulations are critical in appraisal of validity, and it can hardly be gainsaid that they have substantial religious impact and consequences.

It is inescapable that compulsory chapel operates to encourage religious tendencies of cadets. Admiral Moorer conceded in his testimony (Tr. 267–271) that chapel attendance tends "to strengthen a man's religious ties" in most cases, and specifically that the requirement of attendance—over and above the course of merely making a chapel available—has "the effect of encouraging his religious tendencies." [7]

The adverse effect of compulsory chapel on religious sentiment was also the subject of evidence. The General Commission on Chaplains lauds voluntary attendance, by those who come to learn as well as participate, but opposes compelled attendance as a hindrance and inhibition of religious worship by those seeking a meaningful and devout relationship with their God and fellow believers. This was the thrust of testimony at the trial by various ministers. [8] The testimony of cadets and chaplains presents in the record the development of resentment, hostility and synicism toward religion engendered in cadets subject to the chapel requirement. The position of the General Commission on Chaplains is before us not only in amicus curiae memorandum (*supra*, note 3), but in the testimony of its deputy secretary, Reverend A. Ray Applequist. He testified that in 1964 the Commission considered the subject of compulsory chapel attendance, because of growing opposition and concern from cadets and church leaders, and the adverse effect on recruitment of Protestant chaplains. The Commission prepared on behalf of its 35 member denominations a position paper against mandatory attendance, and petitioned the Defense Department to drop the mandatory requirement. Reverend Applequist further testified, from his experience as an Army Chaplain, concerning Academy officers who declined to attend chapel after graduation, explicitly stating they had been adversely affected by the experience, as characterized by one, of "having religion rammed down my throat for my four years at the Point." However the Government's witnesses, like Admiral Moorer, were not familiar with any such problem of weakening of religious ties.

The District Court acknowledged the "forceful testimony" adduced by plaintiffs as to the generally negative effects of compulsory attendance at worship services, and the testimony that manda-

---

mands which may be motivated by moral, spiritual, or ethical considerations. Regular attendance at religious services is an important part of the development and training of prospective officers of the Armed Services. It is, therefore, the general policy of the Superintendents of the Service Academies of the United States of America that cadets and midshipmen will attend regularly scheduled religious services. It is understood that intelligent provisions must be made for bona fide cases where attendance would be in conflict with sincerely held convictions of individual cadets or midshipmen.

7. Admiral Moorer instanced "a midshipman who attends, initially, and who has been raised by a family who did not require their children to go to church, might receive from the service, some inspiration, some motivation of his belief that would create in him a desire to be more active in the church." (Tr. 268).

8. Reverend Glyn Jones, Baptist minister with over 23 years of service as a Navy chaplain; Father Robert Drinan; Rabbi Eugene Lipman; Reverend Dean Kelly, of the National Council of Churches.

tory attendance will have some religious effect on some of the cadets, but stated that "plaintiffs failed . . . to demonstrate that the effect is anything but slight, insubstantial, and non-extensive." The District Court cited that the regulations provided that a cadet may be excused from attendance for sincerely held reasons or beliefs. Such excuse, even if readily available, would not negative the existence of a religious practice forbidden by the Establishment Clause, see Abington School Dist. v. Schempp, *supra*, 374 U.S. at 224–225, 83 S.Ct. 1560.

Moreover, it is plain that the excuse provision does not in fact mitigate the rigidity of the compulsory requirement. It is available only to a cadet able to prove "beyond any reasonable question of doubt" that chapel attendance would be "counterproductive," as interfering with his awareness of the effect of religion on others. (Tr. 79; Assistant Secretary of Defense Roger Kelley.) It is not sufficient that the cadet does not believe in a Supreme Being, or that he feels that mandatory chapel attendance violates his conscience or inhibits his moral development. No cadet has ever been excused at West Point, and four cadets who sought to be excused in 1969 were called "troublemakers." At the Naval Academy, there were three excusals in the past 40 years. The rigidity of the attendance requirement is underscored by the policy concerning transfer from one church or chapel service to another: the cadet must get the permission of both chaplains, and the permission of his parents, at least if he is under 21, and must demonstrate a sincere desire to affiliate with the stated denomination.

5. When a practice, like compelled church attendance, is religious in general significance, as well as origin, and the defense is put that a particular context marks an exception where the practice is secular, the conclusion that the particular compulsion is permissible requires an extraordinary showing. No such showing has been made as to compulsory chapel at the Academies. The badge of religious establishment has not been swept away; the religious characteristic has not been shown to be a mere "vestige," or a mere "ceremonial" feature devoid of any meaningful religious impact.

The conclusion that compelled chapel attendance must be considered as retaining a substantial religious character does not necessarily end the case. The question arises whether the government's use of a practice that bears a religious impress is saved from unconstitutionality because of an overriding state interest in effective training of its military officers. That is the nub of this case, as I see it. For the government to invoke this possibility of justification it must show the clearest kind of imperative, and lack of alternative, for the "government may not employ religious means to serve secular interests, however legitimate they may be, at least without the clearest demonstration that nonreligious means will not suffice." [9] The burden on the government is at least as great as when it offers a secular justification to deny a claim under the First Amendment right of free exercise of religion, and there the Court has insisted that there must be more than a showing by the Government of a rational relationship to a state interest, there must be a showing that the governmental interest is "compelling", and "that no alternative" measures are available that could be used "without infringing First Amendment rights." Sherbert v. Verner, 374 U.S. 398, 406–407, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *cf.* Shelton v. Tucker, 364 U.S. 479, 487–490, 81 S.Ct. 247, 5 L.Ed. 2d 231 (1960). The government action is unconstitutional unless it is "necessary" to promote a compelling governmental interest.[10] That burden persists under the formulation that there must be

---

9. See Justice Brennan concurring in Abington School Dist. v. Schempp, *supra*, 374 U.S. at 265, 83 S.Ct. at 1594.

10. Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed. 600 (1969).

no "excessive" entanglement with religion.[11]

The government simply has not made the required showing that its interference with religious freedoms is compelled by, and goes no further than what is compelled by, the effective training of military officers needed for survival.

a. The concept of government necessity is undercut by the fact that approximately 95% of the Service officers do not graduate from the Academies,[12] and have never been subject to this compulsory chapel requirement.

The District Court made reference to the interest in the training of "the key reservoir of officer talent" as effective combat leaders. Apart from generalities, the only specific testimony in the record on this point was Admiral Calvert's reference (Tr. 7–8), from experience, to the occasional need for commanding officers to conduct religious exercises, on the eve of battle. The official position is not premised on this need for a surrogate-chaplain, notwithstanding its emotional tug, presumably in recognition that it proves too much, and ultimately calls for the service of someone steeped in religion. Only a limited training would be needed to ensure a relatively simple service by a secular commanding officer; secular judges have been able, with general experience and without special training, to conduct often eloquent marriage services.

If we move toward a religious-type comfort to men under stress, or to "sensitivity" awareness, as a compelling imperative, neither judicial notice nor the record establishes how this can be at the same time required for Academy graduates and not for the bulk of the officers, including those closest to the men. In certain respects, Academy graduates can set the standards for the entire officer corps. But if there is truly an imperative need for Academy officers to obtain sensitivity training through personal observation of worship, they could not pass it along to non-Academy officers who have not had such observation.

The long-standing restriction of the chapel attendance obligation to Academy graduates seems to me a powerful demonstration that it is not a necessity in the making of an officer. And constitutional doctrine will not support an infringement of religious liberty except on a showing of unquestioned and imperative necessity.

b. The church leaders and groups opposing compulsory chapel made it clear to the Defense Department that they shared its objectives of enhancing officer sensitivity to the religious wellsprings of servicemen, but believed these did not require the overriding of the voluntarism essential to the vitality of religious life, and could best be achieved by focusing on strong programs encouraging voluntary attendance at chapel and church services and by providing a regular place in the training schedule, including formal instruction, for the overall achievement of the "vital concerns" of the training objectives.[13] The significance of this viewpoint is underscored by the fact that it does not reflect an attitude of implacable opposition to any and all involvement of the military in religious matters; these groups approved the military's maintenance of chaplaincies and places of worship as necessary to provide religious services sought by military personnel on a voluntary basis.

11. Walz v. Tax Commission, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

12. The essence of this conclusion is not negatived by the fact that the 95% figure requires adjustment because Academy graduates account for a disproportionate percentage of combat officers and stay in service longer.

13. *E. g.*, the Oct. 1964 statement authorized by the Executive Committee of the General Commission on Chaplains (Plf. Exh. 36) and the United Presbyterian Report on the Military Chaplaincy May 1965, adopted by the 177th General Assembly of the United Presbyterian Church, U.S.A., reprinted in Church, State and Chaplaincy (ed. A.R. Applequist, 1969), Plf. Exh. 38, at 44.

The deciding officers did not accept that suggestion. Admiral Moorer testified on direct that he felt that classroom instruction in comparative religion, religious beliefs and moral values, would be "artificial." The record discloses, however, that such courses have been given at the Air Academy, and that the Superintendent of the Naval Academy testified that in his view coursework "might be more effective in some ways." [14] But the officers concluded, to quote Admiral Moorer's testimony, that it was preferable to permit observation "in a real world, so to speak." While the District Court did not discredit the testimony and views of church leaders and groups, it stood them on a lower rung. "As moralists the Court must accord them due deference, but in matters military the Court feels constrained to look to the military experts. . . . To accomplish the end involved—the complete training of future military leaders—it is the judgment of military experts that secular means would not suffice."

The fact that the judgment of the District Court is couched in terms of a finding cannot be determinative of the outcome of a constitutional litigation requiring an appraisal of fundamental values.

That is demonstrated by the decision declining to sustain a district court determination that the Sunday closing law reflected no secular interest. Gallagher v. Crown Kosher Super Market, 366 U.S. 617, 81 S.Ct. 1122, 6 L.Ed.2d 536 (1961).

The District Court failed to take into account that what is involved is necessarily a composite, and not a purely military judgment. Concerning the training of men to understand the religious sentiments of others, educators, psychologists and church men would seem to have significant standing. In essence, all that is shown on the record are conclusory opinions of military officers. These simply do not suffice for the extraordinary showing of military necessity that is required for justification to override religious freedoms.[15]

c. If a practice is to be upheld as secular, it must be confined, under strict safeguards, so as to insure wholehearted secularity of purpose and thrust. That is plainly not the case of the regulations brought before us.

Thus, there is no substantial justification of the necessity of what may be characterized as the "intensity" requirement of the regulation—which prohibits the cadet from attending the services of more than one religious group. This

14. See Tr. 9:

"It is my opinion, based on my experience which I have had over some 30 years of experience in the Navy, that [compulsory chapel attendance] is the best way to produce an understanding of the Judeao-Christian principles that really are at the basis of much of Western Civilization as well as American.

"Now, it is true that teaching these things at the Naval Academy in regular courses might be more effective in some ways, but I am sure the Court realizes the objections that might be raised to the teaching of religious courses at the Naval Academy as such."

He clarified that he was not referring to constitutional questions, but to what might be "approved by higher authority as part of our curriculum" (Tr. 10).

15. The record does not indicate either that the military officers gave any consideration to the concern that they might be unwittingly perpetuating the leaning of a system religious in origin, a system that might tend and have tended to attract officers of a religious turn of mind; or that, prior to adopting the imperative of a chapel attendance requirement of the duration, rigidity and intensity reflected in this record, they made a full-scale inquiry, and obtained the insight of, *inter alia*, educators and psychologists. The limited input preceding the "educational" reorientation of the chapel program is suggested by the testimony of Admiral Calvert of the Naval Academy indicating he was not even aware of the existence or values of the comparative religion course given at the Air Academy (Tr. 132). A broader inquiry and perspective may well have developed significant indications that such educational benefit as is available from personal observation would be enhanced by abandoning the kind of chapel requirement in effect, and by structuring a curtailed observation program in the context of a patently secular course.

structure is particularly hard to comprehend in view of the claim that the purpose of the regulation is to inculate awareness of the sentiments of others, the men they will command, rather than to inculcate religious feeling in the cadets themselves.[16] In the absence of necessity, this insistence on attendance at a single church is an "excessive entanglement" with an established religion. This point is underscored by the testimony of Assistant Secretary of Defense Roger Kelley, who was asked why cadets should not go to services of all three religions or more. He replied that this was a good question, and he tended to believe the greater exposure would enhance a cadet's understanding, but this was not administratively feasible.[17] There may be elements of administrative convenience in denying leave to attend different places of worship, but administrative convenience does not loom large as an imperative requiring such intensity of church requirement.[18]

The approach of the military officials seems permeated with a sense of tradition, which is laudable, but not a justification for disregarding First Amendment considerations, and by an attitude that the cadets have no "right" to attend the Academy, a view which fails to appreciate that they do have a right to be free of unconstitutional requirements, and to be entitled to attend the service academies, assuming they are qualified and duly selected, without being subject to unconstitutional conditions.

The Government asks us to engage in a kind of repair carpentry, to sever out any particular aspects of the regulation deemed constitutionally objectionable. The problem is deeper than that. The court must take the regulations and practice as they are, not as they might have been. As they stand, they are marked by religious character and impact not shown to be unavoidable and imperative. They are a violation of the Establishment Clause.

MacKINNON, Circuit Judge, dissenting:

Each religion clause [1] case seems to turn on its unique facts and to involve the interplay between different principles; this case is no exception. The majority opinions, however, seem to me to apply the decisional language of the prior cases in a manner which does not fully consider the unique factual situation which confronts us here. I have no criticism of their quoted references to prior holdings, or of their statements of the general principles that have been considered to be controlling in other cases. They do, however, overemphasize the controlling effect of the constitution-

---

16. The standard that prohibits a cadet from changing from the church of his youth unless he desires sincere affiliation relegates his knowledge of other religions to hours plucked from holiday or free time, since he is not permitted to attend regular Sunday services. The requirement that the cadet obtain the consent of both ministers and his parents (at least as to cadets under 21) contrasts with the government argument that the cadet may be subject to greater compulsion than school children because of his maturity.

17. See Tr. 89–90. He focused on the constraints of time. He did not specifically indicate why freedom to attend more than one place of worship could not be permitted in lieu of, or as part of, some compulsory chapel.

18. While administrative considerations may loom larger for officers and men not affiliated with the three primary religions, it is not without significance that the Academy regulations seem to be oblivious to their problem. Even creeds like Humanism or Rationalism, which profess no belief in a Supreme Being but represent a set of firmly held moral and ethical convictions, are an important part of the moral fabric of our pluralistic society. Compare United States v. Seeger, 380 U.S. 163 (1965). There is no indication in the record of an approach to the problems of officers' training that takes into account the needs of soldiers who must face times of stress without the support of the doctrines of the three most prominent religions.

1. The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

al provisions they rely upon. This over-emphasis is their principal error as I see it. One of the opinions also further extends such conclusions to impermissible limits by claims of "per se violations" and "presumptions of invalidity" that tend to substitute assertion and characterization for logic. I find that their analysis, which fundamentally is based on an absolutist approach to the First Amendment, does not furnish a basis for a proper decision of this case.

It is my basic conclusion that the chapel attendance regulations of the academies are within the military power of the United States Government as recognized by the Constitution, and that the First Amendment does not require a different conclusion. The majority opinions overly stress the application of the First Amendment and seem almost to fail to recognize the Nation's inherent military power; they apparently assume that the First Amendment has overriding supremacy. In doing so they fail to give adequate recognition to the basic power, recognized in the Constitution, under which the armed services educate and train the Nation's future military leaders. I find in the Constitution both a recognition of the military power and the guarantees of freedom of religion, and I believe that these two provisions must be interpreted together.

In approaching the task of accommodating these constitutional provisions, there are many factual similarities to previous cases involving the religion clauses of the First Amendment. We are involved, once again, in exploring the relationship between student and school albeit we are here dealing with higher education and not secondary schools where attendance is compulsory and the pupils are of tender years. We must deal with the traditional problems posed by the educational institution's assumption of responsibility, *in loco parentis*, for the physical well-being as well as the moral and intellectual development of the student, while acknowledging the deference we owe to the essentially contractual relationship between the more mature college-age student and his institution.[2]

However, the overriding factual difference in this case derives from the crucial role these educational institutions play in our military establishment. Unlike civilian and secular institutions, which are properly concerned only with the physical and intellectual development of their students, moral and character development are vitally important objectives of the service academies whose function is to prepare young men for assuming the grave responsibilities of military leadership.[3] In the judgment of

---

2. College authorities stand *in loco parentis*, concerning the physical and moral welfare and mental training of pupils. Gott v. Berea College, 156 Ky. 376, 161 S.W. 204, 206 (1913). The relationship between a private college and a student is basically contractual. University of Miami v. Militana, 184 So.2d 701, 704 (Fla. App.1966) ; John B. Stetson University v. Hunt, 88 Fla. 510, 102 So. 637, 640 (1925) and cases cited; Barker v. Trustees of Bryn Mawr College, 278 Pa. 121, 122 A. 220 (1923) ; 14 C.J.S. Colleges and Universities § 24, p. 1358 (1939). While many of the features of the relationship between the cadets and the service academies are prescribed by statutes and regulations, the relationship is one for military service of a definite character and has certain contractual overtones as well, much the same as enlistments in the armed services. *See* Winthrop, Mili-

tary Law and Precedents 545–47 (Reprint 1920).

3. The military academies present a four-year course of undergraduate study in a highly regimented atmosphere of order and discipline. From the time a cadet or midshipman enters the academy his personal life as well as his school life is under *academy control. His entire day* follows a prescribed schedule. The educational and training program places great emphasis on developing character and qualities of leadership so that each cadet and midshipman will lay the groundwork for a career not just as an officer but as a future military leader. Since their founding, the military academies have produced practically all our great military leaders. While the military academies produce only about 5% of the total officers it is a fair estimate that graduates of the three military

those military commanders who have been most closely involved with this training through the years, some minimal *exposure* [4] *to religion*—a force of major importance in the lives of many of the men they will be asked to command—is an absolute necessity in the academies' program of moral and character development.

This major factual distinction makes it impossible to consider this case as merely a sterile regulation requiring a group of people to attend religious services. These regulations must be examined through the overlay of their importance in properly effectuating the constitutionally recognized power of the armed services to train the necessary personnel to adequately defend this Nation. It is my view that no violation of the First Amendment results from the conflict between such power, as reflected in the academies' curricular requirement to attend chapel services for one hour each week,[5] and the necessity of observing religious practices to the moral development of our future military leaders. Several additional factors particularly

aid me in reaching the conclusion that the First Amendment effects of the chapel attendance requirements are *de minimis* at best, and are clearly overriden by their importance to the proper training of our military leaders: the religious exposure required is to the family religion of the individual cadet or midshipman; the parents are consulted as to any problems that arise;[6] the regulation is fully disclosed to applicants prior to their entering the academies;[7] *attendance* only at chapel, and not participation is required;[8] belief or nonbelief is not imposed;[9] and those who have a bona fide objection to attending services on grounds of conscience may be excused.[10]

## I. THE MILITARY POWER OF THE NATIONAL GOVERNMENT

The Constitution provides that Congress shall have power "to raise and support Armies . . . to provide . . . a Navy [and] to make Rules for the Government and Regulation of the land and naval Forces." [11] These enumerated powers necessarily imply

---

academies constitute 90% of our highest military officers. It is not to be assumed that every officer meets the necessary requirements of a military leader.

4. A very minimal exposure is all that is involved in the regulation.

5. The Air Force Academy exempts first classmen (seniors) from mandatory chapel.

6. The strong role of the family in the religious activities and education of their children was recognized in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

7. *E. g.,* the catalogue of the Military Academy (Ex. B. p. 76) states: "Each cadet must attend one of the weekly chapel services—Protestant, Catholic, or Jewish."

8. The 1969 Record of Proceedings of the Conference of Superintendents of the Academies of the Armed Forces states:
It is the consensus of the four Superintendents that the purpose of regular attendance at religious services is to

instill a sense of respect for religion as a factor in the daily lives and activities of the vast majority of mankind. It is through this respect that officers of the Armed Services can come to understand problems within their future commands which may be motivated by moral, spiritual, or ethical considerations. Regular attendance at religious services is an important part of the development and training of prospective officers of the Armed Services. It is, therefore, the general policy of the Superintendents of the Service Academies of the United States of America that cadets and midshipmen will attend regularly scheduled religious services. It is understood that intelligent provisions must be made for bona fide cases where attendance would be in conflict with sincerely held convictions of individual cadets or midshipmen.
Pl.Ex. 10, p. 32.

9. *Id.*

10. *Id.*

11. U.S.Const. art. I, § 8, cl. 12, 13, 14. It was not necessary to insert these powers in the Constitution to vest the na-

the power properly to train the necessary personnel.[12] This must include the power and authority to specially train a select group of officers in order to guarantee that our Nation will not want for qualified military leaders in the future. Congress has delegated this training responsibility to the various armed services;[13] and students at the academies are members of the armed forces.[14]

The unfettered power to raise armies and provide a navy was recognized in the original Constitution and the power was conferred on Congress rather than the Executive. Of necessity, because of the strong purpose it serves, it is a great power. Its existence was recognized in the Constitution prior to the adoption of any of the Constitutional Amendments, and several decisions indicate that a number of the Constitutional Amendments are not strictly applicable to the military.[15] Most of these decisions relate to criminal proceedings and the

tional Government with such power but rather to designate that Congress alone and not the President can raise armies. II Story, Commentaries § 1187 (4th ed. 1873). The Constitution places no express limitations on the military power. It is an inherent power of any nation.

12. "A constitutional power implies a power of delegation of authority under it sufficient to effect its purposes." Lichter v. United States, 334 U.S. 742, 778–783, 68 S.Ct. 1294, 1313, 92 L.Ed. 1694 (1948).

13. 10 U.S.C. §§ 3012, 5012, 8012 (1970). Command and supervision of the academies is provided for by 10 U.S.C. §§ 4334 (Army), 9334 (Air Force) (1970).

14. Cadets and midshipmen are subject to the punitive articles of the Uniform Code of Military Justice (Articles 77 through 134) and have continuing military obligations. Cf. 10 U.S.C. §§ 516, 4348(b), 6959(b), 9348(b) (1970); United States Dept. of Defense, Manual for Courts-Martial ¶ 16a, at 212 (1969 Rev. ed.) (hereafter cited as Manual for Courts-Martial).

15. In Dynes v. Hoover, 61 U.S. (20 How.) 65, 79, 15 L.Ed. 838 (1857), the Supreme Court held that the military provisions of the Constitution authorize Congress to provide for the trial and punishment of military offenses in the manner then and now practiced by civilized nations without any connection between such power and the Third Article of the Constitution defining the judicial power of the United States. "The two powers are entirely independent of each other." Thereafter, Chief Justice Chase in his concurring opinion in Ex parte Milligan, 71 U.S. (4 Wall.) 2, 137–138, 18 L.Ed. 281 (1866), remarked:

It is not denied that the power to make rules for the government of the army and navy is a power to provide for trial and punishment by military

courts without a jury. It has been so understood and exercised from the adoption of the Constitution to the present time.

Nor, in our judgment, does the fifth, or any other amendment, abridge that power. "Cases arising in the land and naval forces, or in the militia in actual service in time of war or public danger," are expressly excepted from the fifth amendment, "that no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury," and it is admitted that the exception applies to the other amendments as well as to the fifth. (Emphasis added)

It has become well settled that the right to trial by jury guaranteed by the Sixth Amendment is not applicable to trials by courts martial or military commissions. Whelchel v. McDonald, 340 U.S. 122, 127, 71 S.Ct. 146, 95 L.Ed. 141 (1950); cf. Kahn v. Anderson, 255 U.S. 1, 8–9, 41 S.Ct. 224, 65 L.Ed. 469 (1921); Ex parte Quirin, 317 U.S. 1, 40–41, 63 S.Ct. 2, 87 L.Ed. 3 (1942). Easley v. Hunter, 209 F.2d 483, 486 (10th Cir. 1953) states:

It has been indicated in a number of cases that the power of Congress in the government of the land and naval forces of the United States are not affected by any of the constitutional amendments. Hiatt v. Brown, supra, [339 U.S. 103, 70 S.Ct. 495, 94 L.Ed. 691]; Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255; Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3; Ex parte Milligan, 4 Wall. 2, 71 U.S. 2, 138, 18 L.Ed. 281. (Emphasis added.)

This may be an overstatement of the law. Those cases related to essentially criminal matters. A more accurate statement may be that the amendments do not literally affect the judicial powers of the land and naval forces, but the military's judicial

legal principles upon which they are based may have only a limited application to First Amendment rights,[16] but they do indicate the posture of the Nation's military power as recognized by the Constitution. *In any event it is clear that the First Amendment is not fully applicable in the armed services.* The 1800 statute, *supra* note 16, was mandatory and exceeds the present academy

tribunals for a long time were generally considered to be required to comply with the spirit of such amendments. *See*, as to the Sixth Amendment right to counsel, Winthrop, *supra* note 2, at 165 n. 38; right to confrontation of witnesses, *id.* at 287 n. 27; prohibition against excessive fines and cruel and unusual punishment, *id.* at 298.

The Uniform Code of Military Justice, 10 U.S.C. § 801 et seq., has subsequently provided more recognition for some of these constitutional guarantees: *e. g.*, Art. 31 prohibits constitutional self-incrimination; Art. 49 authorizes use of depositions thus minimizing the guarantee of witness confrontation; and an accused is given a right to counsel of his own choice, with some exceptions, Manual for Courts-Martial ¶ 48. However, the statutory nature of these enactments with respect to these basic constitutional guarantees is a recognition of the special status of the military with respect to some of these matters. It may well be that the constitutional power in Congress to provide for the government and regulation of the land and naval forces furnishes more support for the conclusion expressed in this opinion than I have afforded it. Certainly, when such power was conferred on Congress in the original Constitution, it was not subject to any religious restriction whatsoever. *See* nn. 16, 17, *infra*.

16. At one time Article 52 of the Articles of War "earnestly *recommended* to all officers and soldiers diligently to attend divine services." Winthrop, *supra* note 2, at 656, comments on this provision as follows:

THE RECOMMENDATION. The Article, in its first clause, differs from the corresponding British article, from which it was directly derived and which *requires* attendance at divine worship, in *recommending* only such attendance; a difference doubtless growing out of the provision in our Constitution, by which Congress is forbidden to make any "law respecting an establishment of religion or prohibiting the free exercise thereof." A statute making it obligatory upon *officers or soldiers* to attend religious services on Sunday (or other day) would be of doubtful constitutionality, *as opposed to the spirit if not to the letter of the organic law.* The Article, therefore, while favoring such attendance, has well left it optional with officers and soldiers whether they will or not be present at any such services. (Emphasis added) (footnotes omitted)

The First Amendment to the Constitution was submitted to the legislatures of the several states on September 25, 1789 by the first Congress to meet under the United States Constitution. Ratification by three-fourths of the states was completed on December 15, 1791. Subsequently, in 1799, when there were still a number of members in Congress who had submitted the First Amendment to the states, and after the amendment had been adopted and its provisions were fresh in the public mind, Congress in the Act for the Government of the Navy required that:

The commanders of the ships of the United States, having on board chaplains, are to take care, that divine service be performed *twice a day*, and a *sermon preached on Sundays*, unless bad weather, or other extraordinary accidents prevent. (Emphasis added.)

Act of March 2, 1799, ch. XXIV, 1 Stat. 709. This act passed both houses without objection, and *without even a roll call vote* (House Journal, Feb. 25, 1799, p. 491; Senate Journal, Feb. 27, 1799, p. 597). In the Senate the bill was recommended by a committee of three, including Senator Goodhue of Massachusetts, who served when the Bill of Rights was submitted. Senator Goodhue was chairman of the committee.

In 1800 Congress replaced the above provision with a stronger one, providing:

Art. II. The commanders of all ships and vessels in the navy, having chaplains on board, shall take care that divine service be performed in a solemn, orderly, and reverent manner twice a day, and a sermon preached on Sunday, unless bad weather, or other extraordinary accidents prevent it; and *that they cause all, or as many of the ship's company as can be spared from duty, to attend at every performance of the worship of Almighty God.* (Emphasis added.)

Act of April 23, 1800, ch. 33, 2 Stat. 45.

regulations. It required that all Navy commanders *"shall . . . cause all,* or as many of the ship's company as can be spared from duty *to attend* at *every* performance of worship of Almighty God."  This indicates that contemporary opinion in Congress, when the First Amendment was fresh in the public mind, was that such a religious attendance provision was not considered to be violative of the religious clauses. In addition, it is certain that the right of free speech is properly subordinated to necessary order and discipline in the armed service, the right of assembly is principally exercised at the call of a bugle, and the right of free exercise of religion is not absolute where military necessity or facilities make it difficult or impossible to recognize.  It could be strongly argued that the Chaplain Corps and service chapels would violate the Establishment Clause if that clause were not modified by the Free Exercise Clause and by the military power which is recognized in the Constitution.  These religious facilities are saved by reading the military and religious clauses together.[17]  Each clause has a certain area in which it is supreme, and where they overlap we must seek accommodation. Neither can be completely absolute.  In so interpreting their provisions, I would conclude that the military power recognized by the Constitution authorizes the academies to include the chapel attendance requirement in their curriculum as a *necessary* part of the academies' training, and that such minimal regulation does not violate the First Amendment to the Constitution.

## II. THE FIRST AMENDMENT

It is clear beyond the need for restatement that absolute separation of church and state is not compelled by the Constitution.  Virtually all of the recent cases involving the religion clauses deal with the permissible limits of governmental involvement with religion.  The Establishment and Free Exercise clauses pose slightly different problems, but I find the impact of these academy regulations on either clause to be no more than minimal.

### A.  *Establishment Clause*

In the most recent Establishment clause cases,[18] decided last term, Chief Justice Burger alluded to the "cumulative criteria developed by the Court over many years" and spoke of "Three . . tests . . . gleaned from our cases" to be applied in Establishment Clause cases.  These are:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the statute must not foster "an excessive government entanglement with religion."

403 U.S. at 612–613, 91 S.Ct. at 2111. In my opinion the chapel attendance requirement violates none of these standards.

### 1.  *Secular purpose.*

The record in this case admits of no other conclusion than that the sole purpose and objective of the academies in promulgating the chapel attendance requirement is secular.[19]  This was the

---

17.  Welsh v. United States, 398 U.S. 333, 371, 90 S.Ct. 1792, 1813, 26 L.Ed.2d 308 (1970) (Justice White, dissenting) : The power to raise armies must be exercised consistently with the First Amendment which, among other things, forbids laws prohibiting the free exercise of religion.  It is surely essential therefore—surely "necessary and proper"—in enacting laws for the raising of armies to take account of the First Amendment and to avoid possible violations of the Free Exercise Clause.

18.  Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) and Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).

19.  The most pertinent evidence on this point was the testimony of Admiral Moorer, Chairman of the Joint Chiefs of Staff : The purpose, of course, is to enhance his leadership and command ability by putting him in a position where he can get a feel, an understanding of the impact of religion on the various types of

substance of the testimony presented by both the academies and the Defense Department, and the trial judge so found. The purpose of chapel attendance is to provide the best possible training for our future military leaders to enable them to acquire the necessary understanding and appreciation of the religious motivations and needs of the men they command. No religious belief is forced or sought to be compelled. Attendance only is required; given attendance, any actual participation is purely voluntary.

Two objections have been raised to this contention. First, that the requirement that the cadets and midshipmen can change their chapel affiliation only with parental consent belies the general educational intent of the regulation and suggests instead an impermissible concern with the content of the religious instruction. I see nothing unconstitutional in this recognition of parental rights by those who are charged with intellectual and moral training—particularly since most cadets and midshipmen are minors[20] who are away from home for the first time. Also, the regulations recognize the cadet's individual right of conscience—regardless of age.

The second objection is the contention that some alternative means exists to accomplish this secular purpose, which would not infringe on the First Amendment's protection. Much of the record in the trial below is devoted to discussing this issue. The military leaders who are charged with the responsibility for training our future officers testified that the necessary familiarity with religion for a fully-trained officer is best implanted through observation in the religion that each officer candidate brings with him to the academy and that the necessary results could not be obtained through classroom instruction. Their judgment on a matter committed to their charge is entitled to great weight. After all, throughout our history, such education and training has produced military leaders who have successfully met all the demands our Nation has placed upon them. On this issue it is much more reasonable to accept the judgment of experience than the opinions of those without any experience in the field.

In my opinion it is wholly appropriate for us to rely upon the judgment of those to whom this training is entrusted that the alternative of classroom instruction in morals, religion and ethics, is not an adequate substitute to achieve the necessary result.[21] It is all very well to state that by eliminating the chapel attendance requirement military interests

individuals and so he can see this in operation; and, consequently, as he acts as a leader in later years, he will appreciate this impact that religion will have on so many people.

&ast; &ast; &ast; &ast; &ast;

[T]hat is the sole purpose. We are in the process of developing leaders and this is a vital part of the overall leadership package; and that is the sole purpose.
App. 51–52. Similar testimony was given by Asst. Secy. of Defense, Roger T. Kelley.

20. The age of minority may be changed in the near future. Newspaper accounts indicate that Maryland has already changed it. Whether the state of domicile or temporary residence would be controlling is not here determined because the matter does not turn upon the age of minority but rather upon the parent and child relationship and the

influence resulting therefrom. *See* note 6, *supra.*

21. The argument is wide of the mark that since 95% of our military officers are trained outside the academies and may not be required to attend chapel at their undergraduate institution, there is no necessity for requiring such attendance at the academies. Actually, such contention is the best argument *for* chapel attendance for the remainder. It should be made certain that some portion, albeit small, have a reasonable familiarity with the religious needs of those serving in the armed services since religion is such a strong and compelling force in our citizenry, particularly in men in combat. The fact that we have been forced since World War II to resort to auxiliary methods to train officers for an expanded military establishment, and have been unable to completely train them, does not mean that we should reduce the quality

"vital to our *immediate* national security" are not really at stake (Opinion at 296, emphasis added.) That is true because all our present military leaders, and those who will be for some time to come, have been properly trained in the past. How about the future? Should we hazard that? In my opinion we should be just as much concerned that *we* do nothing to diminish the quality of our Nation's future military leaders as our predecessors were concerned that our present leaders be thoroughly qualified.

The trial court accepted the judgment expressed in the testimony of those experts who are charged with the training of our future officers. I see no justification for supplanting that judgment with inexperienced opinions that have a lesser creditable factual support in the record.

### 2. *Advance or inhibit religion.*

It is clear that the regulations may have the effect of advancing or inhibiting religion to some extent. By requiring attendance at religious services the academies place their officer candidates in a position that maximizes the likelihood of participation. To those with strong religious beliefs there is little or no effect—they would attend and participate on their own. To those whose religious feelings are not so strong, religion may be advanced—they are more likely to participate than they would otherwise be. To those experiencing unfavorable attitudes toward religion the attendance requirement may inhibit religion by intensifying those attitudes. I consider these effects to be *de minimis* and to be required by the educational

contract that the academies assume when they undertake the training of cadets and midshipmen to be our future military leaders. They could not ignore some minimal exposure to religion. The chapel regulation has had a long existence and it is fully disclosed to applicants prior to their admission. It is not something that is foisted upon them after they arrive at the academies. Thus, those entering the academies knowingly consent to this regulation and all the other regimentation and curriculum requirements involved in their training and education at the academies.

The fundamental requirement imposed on the Government by the First Amendment is, as Chief Justice Burger has characterized it, a "benevolent neutrality." In my view as long as that essential neutrality is maintained, and the effects on religion are as insignificant as here, where minimal attendance only and not belief is required,[22] and conscientious objectors may be excused from chapel attendance, the vital importance of the regulations to the accomplishment of the academies' training objectives demands that we sustain them here. To do so is merely an accommodation of the overlapping interests reflected by the military and religious provisions of the Constitution.

Neutrality is faithfully observed in these regulations. No better description than "neutrality" could be applied to the position the academies have taken on chapel attendance beginning with West Point in 1821.[23] The cadets and midshipmen are merely placed in a position to observe church services of their own denomination; participation is purely

---

of training of our officers at the academies. Thus, Judge Leventhal's criticism that chapel attendance is not universally required for officers who come to the services from schools outside the service academies is not an argument against the *validity* of the requirement at the academies.

22. In evaluating the effect of the chapel attendance regulation it must be recognized that each hour of a cadet's day is scheduled by academy regulations.

23. Act of March 2, 1821 (3 Stat. 615) approved and adopted for the government of the Army of the United States the "General regulations for the Army" compiled by Major General Scott. Ch. XIII, 5.14. These required that all "academick officers and cadets must strictly attend . . . divine service . . . on Sundays." (Regulation 99.)

voluntary. Significantly, the regulations do nothing more than generally provide for carrying forward pre-existing family religious preferences of the cadets and midshipmen. For the future, I would also emphasize the absolute necessity that the academies be certain to provide for a completely fair application of that portion of their regulations which permits conscientious objectors to chapel attendance to be excused therefrom.[24] I would suggest they conform to the controlling principles set forth in the paraphrase of Justice Goldberg's remarks at page 314, *infra.*

The importance of the attendance regulations to the academies' training program is of the highest order, to my mind. It is in the great importance that I place on this portion of the curriculum, which is directed to building the character of academy graduates and qualifying them to understand the spiritual qualities of the men under their command, that I part company with my colleagues. I consider such training to be more important and necessary than they do. As I view the chapel attendance requirement, it is a partial guarantee that our military leaders will be aware of the moral principles that influence and guide our Nation, and that they will be cognizant of the religious needs and motivations of those who serve in the armed services under their command. To assure that our military leaders will meet these standards requires that academy graduates be conversant with religion and not ignorant of its forms or values. The academies have a compelling obligation to the Nation to see that their graduates are fully trained and that ignorance of the spiritual and moral values of our Nation and our servicemen does not occur. We do not wish to train military leaders—who will have the power *in our name* to order the destruction of cities and nations—without some assurances that they have at least been exposed to the principles of basic morality that we stand for as a nation. The stakes are too high—we should continue doing everything humanly possible to avoid future My Lais.

Practically all Americans have some religious background.[25] When our men are mustered into the armed services, and realize they may eventually face combat duty, their interest in religion often quickens. The closer they approach combat with enemy forces the more frequently many of them seek comfort in religion. Few men face death without giving consideration to religious factors.[26] It is thus necessary to insure that our top military leaders, most of

24. Cadets and midshipmen who complain that their conscientious objections to church attendance are not respected may request individual relief from courts after they have processed their complaint through administrative channels of the academy.

25. "We are a religious people whose institutions presuppose a Supreme Being." Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952).

26. For example, during the Civil War in the winter of 1863–64, while the armies of the Confederacy and the Union were preparing for the battles that began with the Wilderness and ended at Appomattox, a tremendous religious revival occurred in the Confederate Army camped on the banks of the Rapidan:

> In every Confederate camp chaplains and visiting ministers erected religious altars, around which the ragged soldiers knelt and worshipped the Heavenly Father into whose keeping they committed themselves and their cause, and through whose all-wise guidance they expected ultimate victory. The religious revivals that ensued form a most remarkable and impressive chapter of war history. Not only on the Sabbath day, but during the week, night after night for long periods, these services continued, increasing in attendance and interest until they brought under religious influence the great body of the army. Along the mountain-sides and in the forests, where the Southern camps were pitched, the rocks and woods rang with appeals for holiness and consecration, with praises for past mercies and earnest prayers for future protection and deliverance. Thousands of these brave followers of Southern banners became consistent and devoted soldiers of the cross. General Lee, who was a deeply

whom are graduates of our Government military academies, have a thorough understanding of the religious needs and motivations of their men. This is a vital morale factor. It has been said: "In war, morale considerations make up three-quarters of the game; the relative balance of manpower accounts only for the remaining quarter." [27] It is thus vitally essential to my mind that academy training continue to include this required minimal *exposure* to one's own religion in this minimal good faith attempt to accomplish these purely secular objectives. To paraphrase Justice Goldberg's concurring remarks in Abington School District v. Schempp, 374 U.S. 203, 306, 83 S.Ct. 1560, 1615, 10 L.Ed.2d 844 (1963): [28]

> The academies must inevitably take cognizance of the existence of religion and the Court must recognize the propriety of allowing cadets and midshipmen at the academies to receive a minimal exposure to religion, with due allowance for those whose conscience would be invaded, so that the religious exposure will be free of hostility or favor and without undue involvement.

### 3. *Excessive government entanglement.*

The record in this case does not indicate that the chapel attendance requirement involves any additional entanglement of Government with religion other than that already existing by the armed services' compliance with the Free Exercise clause.[29] What is involved is nothing more than the academies furnishing the facilities and personnel (chapels and chaplains) necessary to provide military personnel with the opportunity to exercise their own religion. Even if chapel attendance were voluntary the academies would still be required to make substantially the same facilities available for church attendance. The maintenance of chapels and chaplains [30] throughout the armed services guarantees that the constitutional right to free exercise of religion will not be denied while men are serving their country. There is no showing here that these services are materially increased by the attendance requirement, or that the resulting attendance enmeshes government substantially over and above the involvement which would otherwise result from furnishing the fa-

---

pious man, manifested a constant and profound interest in the progress of this religious work among his soldiers. He usually attended his own church when services were held there, but his interest was confined to no particular denomination. He encouraged all and helped all.

Gen. J. B. Gordon, CSA, Reminiscences of the Civil War 229–30 (1903).

27. Napoleon I, Saint Cloud, August 27, 1808.

28. Justice Goldberg's concurring opinion states:

Government must inevitably take cognizance of the existence of religion and, indeed, under certain circumstances the First Amendment may require that it do so. And it seems clear to me from the opinions in the present and past cases that the Court would recognize the propriety of providing military chaplains and of the teaching *about* religion, as distinguished from the teaching *of* religion, in the public schools.

The examples could readily be multiplied, for both the required and the permissible accommodations between state and church frame the relation as one free of hostility or favor and productive of religious and political harmony, but without undue involvement of one in the concerns or practices of the other. To be sure, the judgment in each case is a delicate one, but it must be made if we are to do loyal service as judges to the ultimate First Amendment objective of religious liberty.

374 U.S. at 306, 83 S.Ct. at 1615–1616.

29. *See* note 17, *supra,* and accompanying text.

30. Buildings may be provided for religious worship at the academies. 10 U.S.C. §§ 4354(b) (Army), 9354 (Air Force). Chaplains are provided throughout the services and at the academies. 10 U.S.C. §§ 3064, 3073, 4337 (Army), 5142, 5404, 5576, 6031 (Navy), 8067(h), 8293, 8547, 9337 (Air Force).

cilities necessary to meet its obligations under the free exercise requirement.

The majority opinions do not question the constitutional validity of the Chaplain Corps and the furnishing of religious facilities in the armed services. It is submitted that if it is constitutional for the Government to furnish the extensive religious facilities of chapels and chaplains for religious worship throughout the armed services, and I do not question that it is constitutionally permissible, then it is "necessary and proper" to require that our military leaders be exposed to training sufficient to give them a minimal understanding of the religious commitment and motivation of our people.

### B. *The Free Exercise Clause*

There can be no question that the knowledge and understanding of religion that cadets and midshipmen acquire by chapel attendance operates to guarantee that the right of men in the armed services to fully exercise their religion will be more fully understood and recognized when these academy graduates ascend, as they certainly will, to positions of military leadership.

### III. THE EFFECT OF THE MAJORITY DECISION

Judge Bazelon's opinion states:

This case does not involve programs vital to our immediate national security, or even to military operational or disciplinary procedures. Nor does it appear that the ruling will have any detrimental impact on the academies' training programs. The appellees have made no showing that chapel attendance requirements are the best or the only means to impart to officers some familiarity with religion and its effects on our soldiers.

While some weight must be accorded the military judgment that familiarity with religion is necessary for the all-around officer, it is for this court to assess that decision in constitution-

al terms. In the words of Mr. Justice Jackson, we act not by virtue of a superior competence but by virtue of our commission to protect basic constitutional rights.

At 296. The foregoing fails to consider or reflect upon the effect that deficiently trained officers can have on the personnel of our armed forces and their morale. The passage recognizes that such training is necessary, but suggests that it can be obtained by other means. There is nothing in the record to support this conclusion. The testimony of our military leaders who are charged with the responsibility of supervising our military academies was to the contrary. Trying to give a person an understanding of the moral force and motivation of religion without attending church is like trying teach swimming without water.

However, if we recognize that some training in religion is necessary, and the majority opinions seem begrudgingly to recognize this, we have come a long way. Then the only question is whether it may permissibly be given by requiring attendance at chapel or in the classroom. In my view the United States has authority to educate its cadets and midshipmen so that they will be fully qualified to assume their place as military leaders of the Nation. If those who are placed in charge of our armed services determine that a minimum exposure to the religion of one's own choice is necessary through chapel attendance, and if our 150-year experience has demonstrated that the implementation of this policy does not result in an establishment of religion, it seems to me that we should not be swayed by the vanity of the present and the belated fears of the majority that those 150 years are an aberration of the experience we should expect. I believe this lengthy experience demonstrates that the basic guarantee of the First Amendment is not violated or likely to be violated by the chapel requirement, and I also consider that such training furnishes substantial assurance that the free exercise of religion in the armed

services will be respected.[31]  I accordingly conclude that a "sensible and realistic application of the Religion Clauses"[32] compels a finding that the chapel attendance requirement does not unduly trespass upon the establishment or free exercise provisions.

For the foregoing reasons I respectfully dissent from the majority opinions and would affirm the conclusion reached in Anderson v. Laird, 316 F.Supp. 1081 (D.D.C.1970).  I am in general agreement with Judge Corcoran's reasoning to the extent hereinbefore indicated.

---

31. There has been some objection by various religious bodies to the academies' chapel attendance regulation.  At the same time these bodies seek to bring about a "vigorous and fruitful religious life" in the military through a *"strong religious program"* in which "participation by officers and enlisted personnel is voluntary."  Pl.Ex. 38, p. 44.  They would thus change the present program so as to greatly *increase* the armed forces' emphasis on religion and apply the increased program to all "officers and enlisted personnel."  This suggestion proposes a substantially broader religious program than exists at the present time.  It would change the policy throughout the armed forces to provide for more encouragement of religion and thus depart from the present policy of neutrality.  It seems to me that the present emphasis at the academies is about right.

32. Wisconsin v. Yoder, 406 U.S. 205, 221, 92 S.Ct. 1526, 1536, 32 L.Ed.2d 15 (1972).